IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:13-CR-244 |
| vs. | |
| LUIS MEZA-GALVEZ, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on the defendant Luis Meza-Galvez's motions to suppress (filing 65 and filing 67 as amended by filing 99) and the Findings and Recommendation (filing 110) of the United States Magistrate Judge. The Magistrate Judge recommended that Meza-Galvez's second motion to suppress (filings 67 and 99) be denied, and that Meza-Galvez's first motion (filing 65) be granted as to certain statements made by Meza-Galvez prior to being advised of his *Miranda* rights, but denied in all other respects. Meza-Galvez objected to all aspects of the Findings and Recommendation decided against him. Filing 121. And the government objected to the portion of the order recommending that Meza-Galvez's pre-*Miranda* statements be suppressed. Filing 125.

The Court has conducted a de novo review of Meza-Galvez's motion to suppress, pursuant to 28 U.S.C. § 636(b)(1). For the reasons discussed below, the Court finds that Meza-Galvez's objections are without merit, but that the government's objection should be sustained. Accordingly, the Court will adopt the Findings and Recommendation of the Magistrate Judge, except for that portion finding that Meza-Galvez was in custody when he made certain statements to the police.

**FACTUAL BACKGROUND**

The Magistrate Judge summarized the facts of this case in his Findings and Recommendation, and the parties have not objected to those factual findings. The Court finds that the Findings and Recommendation accurately state the pertinent facts, and so the Court will only set forth the facts that are particularly germane to the present discussion.

On May 24, 2013, the Omaha Police Department was investigating methamphetamine trafficking in the Omaha area. Filing 106 at 7. During the

course of the investigation, police learned that the apartment Meza-Galvez was staying in was being used in connection with the drug conspiracy under investigation. Filing 106 at 9–11, 40–41. At approximately 5:00 p.m., several officers went to the apartment to conduct a "knock and talk." Filing 106 at 12, 32. The officers were wearing ballistic vests with police markings, and had their weapons holstered but visible. Filing 106 at 30–31, 49–50. Detective Branch and Officers Hernandez and Andersen approached the apartment and Branch knocked on the door. Filing 106 at 12. Meza-Galvez answered the door. Filing 106 at 12. Branch, speaking in English, asked permission to enter so that the officers could speak to Meza-Galvez. Filing 106 at 12–13, 27. Meza-Galvez did not verbally respond but held the door open and walked away from the door, which Branch understood to mean that he and the other officers had Meza-Galvez's permission to enter. Filing 106 at 13, 21.

The apartment was a "very small" one-bedroom apartment with a living room, kitchen, bedroom, bathroom, and furnace room. Filing 106 at 14. Upon entering, Branch followed Meza-Galvez into the living room while the other two officers conducted a protective sweep of the apartment and confirmed that no one else was present. Filing 106 at 15, 37–38. Once in the living room, Branch noticed a stack of U.S. currency on a coffee table next to a notebook with names and numbers, which appeared to Branch to be a ledger of drug sales activities. Filing 106 at 17–18.

Branch explained to Meza-Galvez that he and his fellow officers were there as part of an investigation into narcotics trafficking. Branch asked Meza-Galvez if he was staying at the apartment and if he would grant the police permission to search. Filing 106 at 13, 15, 37. It quickly became apparent that Meza-Galvez did not understand what Branch was saying, and Officer Hernandez, who is fluent in Spanish, began repeating what Branch had stated in Spanish. Filing 106 at 13, 15–16, 29, 42. Branch testified that Meza-Galvez then nodded, which he took as an indication Meza-Galvez understood Hernandez. Filing 106 at 16. Hernandez testified that Meza-Galvez appeared to understand what he was saying, and appeared to be of average intelligence and not under the influence of drugs or alcohol. Filing 106 at 44, 52.

Hernandez then asked Meza-Galvez whether there were any drugs in the apartment. Filing 106 at 43. Meza-Galvez pointed to a "little door" and said "yes, under the boiler." Filing 106 at 43. The officers then patted Meza-Galvez down for weapons, and he sat (or was directed to sit) on the floor. Hernandez then asked if Meza-Galvez would grant the police permission to search the residence. Meza-Galvez responded that he did not have the authority to give them permission, because it was not his apartment. Meza-Galvez was then placed in handcuffs. Filing 106 at 18, 33–34, 43–44, 50, 52.

Hernandez testified that all of this occurred within 5 minutes of entering the apartment. Filing 106 at 50. Branch and Hernandez testified that throughout the encounter they spoke to Meza-Galvez in normal, conversational tones. Filing 106 at 38, 44. And Branch testified that Meza-Galvez's demeanor was calm and collected. Filing 106 at 39.

Thereafter, Branch left to obtain a search warrant. Filing 106 at 34. Hernandez then read Meza-Galvez the *Miranda* advisement in Spanish and provided him with a Spanish-language rights advisory form. Filing 106 at 44–48; Exh. 1. Meza-Galvez agreed to waive his rights and continued speaking with Hernandez, and thereafter made further incriminating statements. Filing 106 at 48–49.

## ANALYSIS

Meza-Galvez argues that his statements to police and the evidence recovered from the apartment should be suppressed because (1) he did not voluntarily consent to the officers' entry of the apartment; (2) his statement that there were drugs in the apartment was the product of custodial interrogation made prior to any *Miranda* warning; (3) his statements to the police were involuntary; and (4) the search warrant was not supported by probable cause.

The Magistrate Judge rejected the majority of Meza-Galvez's arguments, and the Court concurs in the analysis and conclusions of those portions of the Findings and Recommendation. The Court will therefore discuss those matters only briefly. First, Meza-Galvez was at least temporarily residing at the apartment and therefore had a reasonable expectation of privacy in the apartment and standing to challenge the officers' entry. *See United States v. Wiest*, 596 F.3d 906, 909–910 (8th Cir. 2010).

Second, Meza-Galvez manifested consent to Branch's request to enter the apartment, and the officers' entry was thus lawful. The focus of the Court's inquiry is not whether Meza-Galvez, who claims not to have understood the officers' request in English, actually consented to the officers' entry, but whether a reasonable officer would have believed consent was given. *See United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009). This can be inferred from a suspect's words, gestures, or other conduct. *Id.* When Branch asked permission to enter, Meza-Galvez held the door open and walked away from the door. As the Magistrate Judge explained, this would lead any reasonable law enforcement officer to believe he had been granted permission to enter. Filing 110 at 5–6.

The Magistrate Judge further found that the later-obtained search warrant for the apartment was supported by probable cause, and that there

was sufficient probable cause to believe evidence of drug trafficking would be found in the apartment even if all facts learned after the initial entry into the apartment were excised from the supporting affidavit. Filing 110 at 7–8. Given what the officers had already learned through their prior surveillance and questioning of Meza-Galvez's co-defendants just prior to their arrival at the apartment, *see* filing 110 at 2, this Court finds likewise.

This brings the Court to Meza-Galvez's statements to police, and in particular, his admission that there were drugs in the apartment. *Miranda v. Arizona*, 384 U.S. 436 (1966), requires that law enforcement agents provide certain prescribed warnings before conducting an interrogation of a suspect who is in custody. There is no doubt that the questioning of Meza-Galvez constituted interrogation; the only dispute is whether Meza-Galvez was in custody at the time. The Magistrate Judge found that Meza-Galvez was in custody and that his statement must therefore be suppressed. Bearing in mind that "the task of defining 'custody' is a slippery one," *Oregon v. Elstad*, 470 U.S. 298, 309 (1985), and that this Court is obligated to conduct a de novo review of this matter, the Court declines to adopt this portion of the Findings and Recommendation, and instead finds that Meza-Galvez was not in custody when he stated that there were drugs in the "boiler."

The ultimate question in determining whether a person is in custody for purposes of *Miranda* is whether there is a formal arrest or restraint on the suspect's freedom of movement of the degree associated with a formal arrest. *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004). Two discrete inquiries are essential to this determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he was at liberty to terminate the interrogation and leave, or in this case, terminate the interrogation and cause the officers to leave. *United States v. Lowen*, 647 F.3d 863, 867 (8th Cir. 2011).

In making this determination, the Court looks to the totality of the circumstances confronting the defendant at the time of the questioning. *Czichray*, 378 F.3d at 826. The Court is also guided by the following factors:

> (1) whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether there was a police-

- 4 -

> dominated atmosphere; and (6) whether the suspect was placed under arrest at the termination of the questioning.

*Czichray*, 378 F.3d at 827 (citing *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)). The *Griffin* factors are not exhaustive or exclusive, and "'custody' cannot be resolved merely by counting up the number of factors on each side of the balance." *Id*. The Court has considered the *Griffin* factors, but finds them to be not particularly instructive in the present case, due in large part to the quickness with which the relevant events occurred.

That said, the *Griffin* factors point both ways. Significantly, Meza-Galvez was not informed that he was free to decline to answer the officers' questions and that he was not under arrest. And he was placed under arrest after being questioned. Pointing the other way, there is no evidence the police employed "strong arm tactics" or tried to deceive Meza-Galvez. Instead, they asked him a straightforward question after informing him why they were at the apartment.

The remaining factors are less helpful. There is little to suggest, one way or another, whether Meza-Galvez possessed "unrestrained freedom of movement." But he was not handcuffed or even patted down prior to his admission. Similarly, with three officers crowded into the small apartment, it may have been a police-dominated atmosphere. But while the apartment was small, there is nothing in the record to suggest that the officers "exploited its cozy confines or invaded the defendant's personal space." *United States v. Hughes*, 640 F.3d 428, 436 (1st Cir. 2011). Finally, Meza-Galvez did not initiate the contact, but he did allow the officers into his house and—as the Court finds below—voluntarily responded to their questions.

In this case, the *Griffin* factors are less informative than simply examining the totality of the circumstances. Meza-Galvez met with the police not in the unfamiliar surroundings of an isolated interrogation room, but in his own (temporary) abode. When a suspect is interrogated in the "comfort and familiarity" of his own residence, the Court is less likely to find the circumstances custodial. *Lowen*, 647 F.3d at 868. The apartment may not have been Meza-Galvez's residence for long, and in that sense, the encounter might best be said to have taken place in "neutral territory." The encounter occurred at 5:00 in the afternoon, which is not a sinister or disconcerting time of day for the police to arrive. Throughout the encounter, the officers spoke to Meza-Galvez in conversational tones. And far from being subjected to a lengthy interrogation, Meza-Galvez had only, at that time, been asked one question. Finally, although Meza-Galvez was alone, the police had not separated him from anyone that might have provided moral or psychological support.

In cases presenting similar circumstances, other courts have not found suspects to be in custody. *See, e.g.*, *United States v. Burns*, 37 F.3d 276 (7th Cir. 1994); *United States v. Osorio*, 2006 WL 2882496 (D. Neb. 2006); *United States v. Landry*, 345 F. Supp. 2d 118 (D. Mass. 2004); *United States v. Cota-Lopez*, 358 F. Supp. 2d 579 (W.D. Tex. 2002). And the Eighth Circuit has not found custody even in cases where police have exerted far greater pressure on the suspect. In *Czichray*, for example, two law enforcement agents showed up at the suspect's house at 6:30 in the morning, questioned him for 7 hours, instructed him to call in sick to work and not to answer his own telephone, escorted him about his house, and told him if he did not cooperate they would interview his 75-year-old father and "light up his world," as well as pressure companies to withhold payments from his business. 378 F.3d at 826. Despite this, the court found the suspect was not in custody. This was largely due to the fact that the agents repeatedly informed the suspect that the questioning was voluntary and that he was free to ask the agents to leave. *Id.* at 826–27.

Meza-Galvez was not informed that he was not under arrest or that he could decline to answer the officers' questions. But neither was he subject to anything even approaching the restrictions or pressure imposed on the suspect in *Czichray*. And the failure to inform a suspect that they are not under arrest, while significant, is not dispositive of the custody inquiry. *Lowen*, 647 F.3d at 868. In cases more analogous to this, the lack of such an advisement has not rendered the encounter custodial. *See, e.g.*, *Osorio*, 2006 WL 2882496; *cf.*, *Burns*, 37 F.3d 276; *Landry*, 345 F. Supp. 2d 118.

The touchstone of the Court's inquiry remains whether Meza-Galvez was restrained as though he were under formal arrest. *Lowen*, 647 F.3d at 868. Meza-Galvez may, or may not, have actually been free to leave at the moment he was questioned. But not every brief detention rises to the level of custody. *Cf. United States v. Martinez*, 462 F.3d 903, 909–10 (8th Cir. 2006). In *United States v. Hernandez-Hernandez*, 327 F.3d 703, 705 (8th Cir. 2003), the defendant was in his front yard with two others when a team of nine law enforcement officers arrived, patted the men down and told them to take a seat, and proceeded to search the defendant's house. While the defendant was seated, an agent questioned him briefly. *Id.* Despite the fact that he was undoubtedly detained for the duration of the search, and was, as here, arrested following the questioning, the court found that he was not in custody. *Id.* at 706.

Considering all of the circumstances, the Court finds that Meza-Galvez's freedom of movement had not been restrained to the degree associated with a formal arrest, and that his statement that there were drugs in the "boiler" should not be suppressed. Because there was no initial *Miranda* violation, the Court further finds no cause to suppress Meza-

Galvez's additional statements, which were preceded by a full and proper *Miranda* advisement.

The Court further finds that Meza-Galvez's statements to police, before and after being given his *Miranda* warnings, were not the involuntary product of police coercion. *See United States v. Aldridge,* 664 F.3d 705, 712–713 (8th Cir. 2011). A statement is involuntary—and its use thus violates the Due Process Clause—when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination. *United States v. LeBrun,* 363 F.3d 715, 724 (8th Cir. 2004). Whether a confession is involuntary is judged by the totality of the circumstances, and the Court examines the conduct of the officers and the characteristics of the accused. *Id.* The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary. *Id.*

The Court finds that the government has met its burden. The record does not suggest that Meza-Galvez's will was overborne. The officers spoke calmly to Meza-Galvez, who was likewise calm and cooperative, and appeared to be of average intelligence and to understand what was occurring. The fact that Meza-Galvez felt free to deny the officers' request to search, even *before* being given his *Miranda* warnings, further demonstrates that his will was not overborne.

IT IS ORDERED:

1. The Court adopts in part, and rejects in part, the Magistrate Judge's Findings and Recommendation (filing 110), as discussed above.

2. Meza-Galvez's objection (filing 121) is overruled.

3. The government's objection (filing 125) is sustained.

4. Meza-Galvez's motions to suppress (filing 65 and filing 67 as amended by filing 99) are denied in their entirety.

Dated this 2nd day of December, 2013.

BY THE COURT:

John M. Gerrard
United States District Judge

- 8 -